IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 23, 2025 Session

## STATE OF TENNESSEE v. NICHOLAS S. COLLINS

**Appeal from the Criminal Court for Sullivan County**
**No. S75901   James F. Goodwin, Jr., Judge**

_____

### No. E2024-00836-CCA-R3-CD
_____

Defendant, Nicholas S. Collins, was convicted by a Sullivan County jury of the following offenses: domestic assault, a Class A misdemeanor (count 2); assault, a Class A misdemeanor (count 3); and aggravated domestic assault, a Class C felony (count 5). He received an effective sentence of seven and one-half years' incarceration. Defendant appeals, arguing that the evidence was insufficient to support his convictions. Upon review of the entire record, the briefs and arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Joseph W. McMurray and R. Wayne Culbertson, Kingsport, Tennessee, for the appellant, Nicholas S. Collins.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Kaylin K. Render, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On August 10, 2022, the Sullivan County Grand Jury issued a presentment in case number S75901 charging Defendant with the following counts: (1) attempted second degree murder, (2) domestic assault, (3 & 4) assault, (5) aggravated domestic assault, (6) vandalism of $2,500 or more, but less than $10,000, (7) harassment, and (8) attempted

aggravated burglary. These charges stemmed from an incident that took place on February 20, 2022. At trial, Defendant was acquitted of attempted second degree murder, but the jury found him guilty of the remaining counts.[1] At issue in this appeal are the convictions in counts two, three, and five.

On January 17, 2022, Defendant's wife, Whitney Collins, told Defendant she wanted a divorce. At that time, Defendant, a trooper with the Tennessee Highway Patrol ("THP"), and Ms. Collins had been married for eleven years and had two minor children. Four days later, on January 21, 2022, Ms. Collins, along with the couple's children, moved into the home of her mother, June Gibson, and her stepfather, Timothy Gibson, in Kingsport, Tennessee.

Ms. Collins described Defendant's behavior after she and the children moved out as "erratic," attributing Defendant's behavior to his increased alcohol use. After Ms. Collins moved out, Defendant sent her text messages that she considered to be of a "scary or threatening nature." In mid-February 2022, Defendant sent Ms. Collins close to fifty text messages, one of which read in part, "I know where you are every day. And I can prove it to you by showing you the picture of it, but I'm not going to do that." Ms. Collins testified that Defendant's text messages left her feeling like she was never safe because it was apparent that Defendant was tracking her. On February 16, 2022, Defendant texted Ms. Collins a photograph of the heart-shaped container which held her father's cremains and two vials which held her father's final EKG tracings before he died. Defendant then sent her a video recording showing him throwing those items into the trash, along with a message that said, "Now I just took your dad away from you."

Ms. Collins testified that Defendant's text messages and his erratic behavior made her feel like "she was in danger." Defendant had been on the S.W.A.T. team for a while, had experience with guns, and owned "a lot" of guns; she knew Defendant always carried a firearm. Based on Defendant's actions, Ms. Collins filed for and was granted an ex parte order of protection on February 17, 2022. In addition to directing Defendant to have no contact with Ms. Collins or their minor children, the order of protection specifically prohibited Defendant from putting Ms. Collins and the couple's minor children "in fear of being hurt or in fear of not being able to leave or get away." The order also put Defendant on notice that "[i]f you try to hurt anyone while this Order, probation, or diversion is in effect, you may face separate charges for aggravated assault, a Class C felony."

On February 18, 2022, Lieutenant Michael Foster of the Washington County Sheriff's Office served Defendant with the order of protection at Defendant's home. A copy of the order was exhibited to his testimony. Lieutenant Foster explained to Defendant

---

[1] The State dismissed the assault charge in count four on the morning of the trial.

that he could have no contact with Ms. Collins or their minor children and that if a permanent order of protection were subsequently granted, Defendant would lose his right to possess a firearm. Lieutenant Foster testified that Defendant acted in a "disorderly manner" when he was served with the order of protection and video from his body worn camera documenting Defendant's behavior was exhibited to his testimony. The video showed that Defendant was initially cordial and respectful, but his demeanor changed when he was informed about the order of protection. Defendant then became argumentative, cursing at Lieutenant Foster and making statements such as "I know more than you. Look at who you are talking to" and "I am the law." Defendant made threats that "he would do what he felt he wanted to do" and hit both his own truck and his THP vehicle with his fists. Defendant threw the copy of the order of protection on the ground. Sergeant Moore and Trooper Blankenship from THP were also present and attempted to calm Defendant. They were there to retrieve Defendant's state equipment and inform Defendant that he was being placed on administrative leave.

Suspecting that Defendant was tracking her van, Ms. Collins began driving her mother's car. She also began to keep a gun, given to her by her stepfather, in her bedroom. When asked why she felt the need to take these extra precautions, Ms. Collins replied that she "felt imminent danger" and was "constantly looking over [her] shoulder." Additionally, the Gibson house was equipped with a security system that included an exterior surveillance camera and motion sensors. Mr. Gibson testified that after Ms. Collins obtained the order of protection, he installed even more motion sensors around the area where they parked their vehicles. Mr. Gibson stated that Defendant was aware of the security system but was not aware of the newly added motion sensors. Mr. Gibson controlled the security camera through an application ("app") on his cell phone and iPad. Activation of the motion sensors set off an alarm inside the house.

Mr. Gibson and Ms. Collins both testified that on February 20, 2022, around 3:00 a.m., all the outdoor motion sensors at the Gibson home simultaneously alerted. Awakened by the noise, Mr. Gibson attempted to access his exterior surveillance camera through his cell phone but discovered a communication failure. Mr. Gibson then got out of bed, put on his bathrobe, and grabbed his handgun. He went to the living room, where he was joined by Ms. Collins. When he attempted to check the surveillance camera from his iPad, Mr. Gibson found that it also indicated a communication failure, even after he rebooted the system. Ms. Collins testified that after having been awakened by the alarm system and learning that Mr. Gibson could not check the cameras, she was shaking and scared and had a "feeling of doom." The two went into the garage and when Mr. Gibson opened the back door, he heard the "loud hiss" of air coming from a tire. He told Ms. Collins to stay inside the house as he proceeded to investigate outside. Mr. Gibson testified that he felt "unnerved" when he was woken from sleep and found that his tires were going flat. While inspecting the cars, Mr. Gibson heard the sounds of sticks breaking and crunching on the

frozen ground. He headed in the direction of the sounds and saw Defendant's truck parked thirty or forty yards down the road with its taillights illuminated.

As Mr. Gibson was looking around outside, Ms. Collins, who was inside the house, called 911 and went to the front door. When she opened the front door, she could see all the way down the driveway, and she saw Defendant as he ran down the driveway toward the road. Ms. Collins began screaming into the phone, "He's here, he's here." At trial, Ms. Collins recalled that when she saw Defendant, she was "scared that he was going to do something to hurt me." While on the phone with the 911 operator, Ms. Collins remembered that Defendant had recently given the couple's daughter an iPhone and had enabled the phone to share its location with his iPhone. When Ms. Collins opened the *Find My iPhone* app on her daughter's phone, she saw that Defendant had been at the Gibson home eight minutes earlier. She took a screenshot showing the location which she later gave to the police. Ms. Collins then joined Mr. Gibson outside, and they walked to the bottom of the driveway where they saw Defendant's truck driving away from the house.

Mr. Gibson admitted that although he recognized Defendant's truck, he did not actually see Defendant. However, he believed Defendant was at his house that night and he was "concerned" because of the existing issues between Defendant and Ms. Collins. Mr. Gibson also admitted that Defendant never spoke to or made any verbal threats to him or Ms. Collins that night. Ms. Collins also confirmed that Defendant did not speak to her or make any verbal threats. While both Mr. Gibson and Ms. Collins testified that Defendant always carried a gun, neither saw him brandish a firearm that night. Ms. Collins assumed he had a gun "because he always had his gun on him" but admitted she could not see him carrying one that night. She explained that she feared Defendant had a weapon with him that night and thought he was going to cause her bodily injury.

Deputy Brandon Trivett of the Sullivan County Sheriff's Office responded to the 911 call at the Gibson home around 3:00 a.m. on February 20, 2022. When he arrived at the Gibson house, he saw gouge marks on the rims of two cars in the driveway and observed that their valve stems had been cut. He also observed that the wires to the security camera had been cut. Additionally, Ms. Collins reported to him that her license plate had been stolen from her van. While on scene, Deputy Trivett reviewed text messages between Defendant and Ms. Collins, including one in which Ms. Collins advised Defendant to stop contacting her. However, Defendant continued sending messages, including ones in which he claimed to know her whereabouts "at all times."

Ms. Collins also gave her daughter's cell phone to Deputy Trivett, and he relayed information regarding Defendant's location from the *Find My iPhone* app to other officers. Shortly thereafter, Defendant was stopped without incident and taken into custody. He was transported to the Sullivan County Jail, where the arresting officer gave Deputy Trivett

items recovered from Defendant's truck during an inventory search conducted by Trooper Ellison. Deputy Trivett documented a holster, a magazine for a BB rifle, two magazines for a handgun, nine-millimeter hollow-point ammunition, a Smith & Wesson nine-millimeter handgun, and an AR-style BB rifle and placed all the items in the evidence locker.

Defendant testified and admitted that his conduct when served with the order of protection was "unacceptable." He said he assumed that he was being served with divorce papers, not an order of protection. He was upset because his job was being affected by the order of protection, and he was hurt because he could not see his children. He said his emotions led him to act in an inappropriate manner "very out of character for him." Defendant also admitted that he had drunk alcohol the prior night and called in sick to work the day he was served with the order of protection. He said he was still feeling the effects of his alcohol consumption and "blame[ed] it all on the alcohol." However, Defendant denied that he had "a drinking problem" and said, "I had a wife problem."

Defendant admitted that he went to the Gibson house early on February 20, 2022, even though he knew the order of protection prohibited him from being around his wife and children. He explained that the van his wife drove was equipped with an app that allowed him to track it. He had used the app to track Ms. Collins and noted that one night she was at a house he recognized as belonging to another man. He took a screenshot of the location to use as evidence at the upcoming hearing on the order of protection. Defendant knew Ms. Collins was driving her parents' vehicles and reasoned that if he went to the Gibson house and disabled her parents' vehicles, Ms. Collins "couldn't drive them cars and she would have to drive her van." Then, he could track the van to document her whereabouts. Defendant admitted to cutting the valve stems on the Gibsons' car tires for the same reason. He also admitted to cutting the security camera wire, but said it was only intended to inconvenience Mr. Gibson, whom he claimed had lied about taking the van for an oil change. Defendant did not think cutting the camera wires and preventing Mr. Gibson from seeing outside would cause Mr. Gibson to be afraid. Defendant claimed he was not angry when he went to the Gibson house. When asked if he was calm that night, Defendant replied, "I knew what I was doing."

Defendant denied having any intention of entering the house that night and claimed he did not go to the house to frighten his in-laws, his wife, or his children. Defendant said he had a key to the Gibson home and could have entered had he wanted to, but he never tried to do so. He stated that he moved away from the house after cutting the security camera wire. Several times during his testimony, Defendant admitted he always carried a pistol, and he agreed that it was always loaded. However, he denied having a weapon on him when he was at the Gibson house on February 20, 2022, even though a handgun was recovered from his truck when he was arrested.

Based on the evidence above, the jury convicted Defendant as charged of domestic assault and aggravated domestic assault of Whitney Collins, and assault of Timothy Gibson. The trial court imposed an effective sentence of seven and one-half years' incarceration. Defendant filed a timely motion for new trial which the trial court denied on May 9, 2024.

Defendant's timely appeal is now before this court.

**Analysis**

Defendant asserts that the evidence presented at trial is insufficient to support his convictions for domestic assault (count 2), assault (count 3), and aggravated domestic assault (count 5). Specifically, Defendant argues that there was insufficient evidence that he acted intentionally or knowingly to cause the victims to reasonably fear imminent bodily injury to support counts two and three and as such, the State failed to prove the underlying assault of Ms. Collins, as required to support count five. The State contends that the evidence is sufficient for each conviction. We agree with the State.

When evaluating the sufficiency of evidence on appeal, the relevant question is whether "*any* reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence presented at trial and to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Davis*, 466 S.W.3d 49, 70 (Tenn. 2015). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the burden of demonstrating that the evidence is insufficient to support the conviction is on the defendant. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, this Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. A conviction may be supported

entirely by circumstantial evidence alone, and contrary to Defendant's assertion, such circumstantial evidence is not required to exclude every reasonable hypothesis except the defendant's guilt. *State v. Tuttle*, 515 S.W.3d 282, 316 (Tenn. 2017).

As charged in this case, an assault occurs when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). "Knowing"

> refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b).

Domestic assault is "an assault as defined in § 39-13-101 against a domestic abuse victim." *Id.* § 39-13-111(b). A domestic abuse victim is any adult "who [is a] current or former spouse." *Id.* § 39-13-111(a)(1).

As charged in this case, aggravated domestic assault is committed by one "who, after having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way. . . committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly. . . commits or attempts to commit an assault against the individual or individuals." *Id.* § 39-13-102(c).

On the date of the offense, Defendant and Ms. Collins were married; thus, Ms. Collins was a domestic abuse victim, *see id.* § 39-13-111(a)(1), and Defendant does not dispute that she was. However, Defendant argues that the State's evidence did not prove beyond a reasonable doubt that Defendant acted intentionally or knowingly to cause Ms. Collins and Mr. Gibson to reasonably fear imminent bodily injury and that the victims did not reasonably fear imminent bodily injury.

Our supreme court has defined "imminent" as:

> Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand,

something to happen upon the instant, close although not yet touching, and
on the point of happening.

*State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (quoting Black's Law Dictionary 750 (6th ed. 1990)). This definition emphasizes the immediacy and proximity of the perceived threat rather than the actual occurrence of harm. This court has held that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear bodily injury." *State v. Cummings*, No. M2023-01345-CCA-R3-CD, 2024 WL 3412259, at *9 (Tenn. Crim. App. July 15, 2024) (quoting *State v. Jackson*, No. M2019-01128-CCA-R3-CD, 2020 WL 2488763, at *13 (Tenn. Crim. App. May 14, 2020)). Thus, actual danger is not an element of assault committed by placing a victim in reasonable fear of imminent harm. Instead, the focus is on whether the victim's fear of imminent bodily injury was reasonable under the circumstances. *See id.*

> This court has explained the nature of the fear of imminent bodily injury as
>
> [t]he fear contemplated by the statute is not the fear of . . . the perpetrator, but the fear or reasonable apprehension of being harmed. As acknowledged by the [defendant], an assault has been defined as an act which conveys to the mind of the person set upon a well[-]grounded apprehension of personal injury or violence. The element of "fear" is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury.

*State v. Stallings*, No. E2005-00239-CCA-R3-CD, 2006 WL 2061736, at *20 (Tenn. Crim. App. July 26, 2006) (quoting *State v. Whitfield*, No. 02C01-9706-CR-00226, 1998 WL 227776 (Tenn. Crim. App. May 8, 1998) (internal citation omitted)).

The proof in this case showed that Defendant knew that at 3:00 a.m., his wife and children as well as his wife's parents would be home. Defendant had been tracking Ms. Collins' van which along with the Gibsons' vehicles was in the driveway when Defendant arrived. Defendant acknowledged that he was prohibited by the order of protection from visiting the Gibson house and said he should not have been there. He also admitted to slashing the tires and cutting the valve stems on the tires of two vehicles, making them undrivable. He confessed to cutting the wire on the exterior surveillance camera, which he knew Mr. Gibson used to monitor the security of the home. For weeks, Defendant had been sending Ms. Collins threatening text messages. Ms. Collins testified that she knew Defendant always carried a loaded weapon. When the security alarm woke her, she felt a "feeling of doom" and said she was scared and shaking. When she saw Defendant in the driveway, she was "scared that he was going to do something to hurt me."

Mr. Gibson was aware of the order of protection Ms. Collins had obtained against Defendant and the underlying facts supporting the order. He testified that after being awakened by the alarm and discovering that the security cameras were malfunctioning, he grabbed his gun before investigating because he was "unnerved."

The evidence was sufficient for a jury to reasonably conclude that Defendant knew that Ms. Collins and her parents would be home and that he intentionally or knowingly caused them to reasonably fear imminent bodily injury. The jury heard and rejected Defendant's argument that he went to the home to gather evidence for the order of protection hearing. The jury considered the testimony and each witness's credibility regarding every element of the assault charges, including Defendant's mental state. This court has stated that when evaluating a defendant's intent, the jury may consider "the character of the assault, the nature of the act and all of the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Regarding Defendant's conviction for aggravated domestic assault against Ms. Collins, Defendant also argues that there was no evidence that he used or displayed a weapon. However, the presentment charged Defendant with intentionally or knowingly causing Ms. Collins to reasonably fear imminent bodily injury after having been enjoined or restrained by an order of protection and the jury was charged accordingly. The evidence clearly showed that an order of protection had been issued and served on Defendant when the assault on Ms. Collins occurred on February 20, 2022. Defendant's argument is without merit.

## Conclusion

For the reasons stated above, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that Defendant intentionally or knowingly caused the victims to reasonably fear imminent bodily injury to support his convictions. We affirm the judgments of the trial court.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE